Argued and submitted October 28, 2015, affirmed February 3, petition for review denied May 26, 2016 (359 Or 667)

**STATE OF OREGON,**
*Plaintiff-Respondent,*

*v.*

**MARK EDWARD BROWN,**
*Defendant-Appellant.*

Marion County Circuit Court
12C47551; A156289

367 P3d 544

Meredith Allen, Deputy Public Defender, argued the cause for appellant. With her on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Joanna L. Jenkins, Assistant Attorney General, argued the cause for respondent. With her on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Duncan, Presiding Judge, and DeVore, Judge, and Flynn, Judge.

DEVORE, J.

**DEVORE, J.**

Defendant appeals a judgment of conviction for murder with a firearm, unlawful use of a weapon with a firearm, and felon in possession of a firearm. ORS 163.115 (murder); ORS 166.220 (unlawful use of a weapon); ORS 166.270 (felon in possession of a firearm); ORS 161.610 (providing an enhanced penalty for the use of a firearm in the commission of a felony). He assigns error to the trial court's partial denial of his motion to suppress statements to police, arguing that detectives violated Article I, section 12, of the Oregon Constitution and the Fifth and Fourteenth Amendments to the United States Constitution by interrogating him after he had requested an attorney. We review for legal error the trial court's ruling that defendant's statements were admissible on the basis that defendant had not yet made an unequivocal invocation of the right to counsel. *See State v. Avila-Nava*, 356 Or 600, 609, 341 P3d 714 (2014). We affirm.

The facts are undisputed. Detective Tallan was called to investigate a murder in a Walmart parking lot in Salem. The victim, Knorr, had been in the parking lot with his girlfriend, talking to another person. As Knorr stood there, a Honda CR-V drove by. The driver pointed a gun through the window, fatally shot Knorr, and drove away.

The investigating detectives identified the Honda as defendant's vehicle and suspected that defendant was the gunman. Police obtained an arrest warrant, located defendant at a Tigard motel room, and arrested him at 7:30 a.m. the next day. After being advised of his *Miranda* rights, defendant agreed to participate in a police interview at the Tigard police station.

At the police station at about 8:20 a.m., Tallan and another detective began interviewing defendant. Tallan advised defendant that the interview would be video recorded and read defendant his *Miranda* rights a second time. Defendant confirmed that he understood his rights and signed an acknowledgment card. In the course of the interview, defendant made inculpatory statements. He admitted that he had been driving the Honda the previous day and that he had told his mother to report the vehicle as stolen.

Tallan asked defendant about a past argument defendant said that he had had with Knorr. Defendant claimed that he had not seen Knorr since the day of the argument. They continued:

"[Tallan]: Well, yeah you did. You saw [Knorr] yesterday morning.

"[Defendant]: No, actually I didn't.

"[Tallan]: Ok.

"[Defendant]: If you can put a gun in my hand, if you can put, dude if you can put a gun in my hand, the gun in my hand, then please go ahead and do so. If not, then we should probably contact my lawyer because then be done here. [*sic*] Because if you can put a gun in my hand, then let's do so.

"[Tallan]: Let's do what?

"[Defendant]: Put a gun in my hand.

"[Tallan]: Ok. I am not sure what that means.

"[Defendant]: That means, where's the gun. Put it in my hand, uh, I didn't shoot anybody. If I would. If I had a problem with [Knorr], I would have got out of my damn, I would have got out of my Honda and I would have whipped his ass. I would have swung on him, I would have thrown down on him, I certainly wouldn't have (inaudible) and shot him. That is the most retarded thing I have ever heard. I would've beat the brakes off of him, him and his, whoever was with him. I don't give a flying rat's ass, I would have whooped his fuckin' ass.

"[Tallan]: Who was with him?

"[Defendant]: I, I don't know. Obviously he wasn't there by himself because, you know, um, there was multiple reports of, uh, man I heard all kinds of crap coming across the news. * * * I wouldn't have shot him. Everything that I know came from my brother telling me what was on the news, then came from the news last night and, um, I didn't even bother turning on the TV this morning, so[.]

"[Tallan]: Ok. You mentioned a lawyer, does that mean that you want to talk to a lawyer or do you want to talk about this?

"[Defendant]:   I have a * * * lawyer on my other cases so she might as well deal with this too. I am telling you, if you got a gun and you can put it in my hand, well then let's do so. If you don't then, get my lawyer up here so I can get the hell out of here because this doesn't work for me.

"* * * * *

"[Tallan]:   So this sounds like a conditional thing.

"[Defendant]:   No, it's not conditional of anything.

"[Tallan]:   It's important that I clarify this okay because I want to keep talking to you and I don't know, I am not sure if you want to keep talking or not, but you have given me this condition of, okay, if I can put a gun in your hand then I gotta bring your lawyer in. Well what if I can't. Okay. I don't know that I can.

"[Defendant]:   But if you can't put a gun in my hands, then we got nothin' to talk about. If you cannot put a gun, if you don't have a gun, you can't put it in my hand—here's my hand, scrape it, scrub it, do whatever it is you gotta do, get up here in my nostrils and my eyes, whatever it is you all gotta do for [gunshot residue tests], whatever, if you can put a gun in my hand, and tell me I fired a gun, then do so, please and we'll move forward in that direction. If not,

"[Tallan]:   Well let me tell you this

"[Defendant]:   then get my lawyer up here so I can the hell [*sic*] out of here.

"[Tallan]:   Well, let me tell you this. All right. When you pulled in there, I'm suggesting that you didn't get out and whoop his ass."

Although the interview continued for some minutes, that content, following Tallan's last statement here, was suppressed by the trial court because the detective's statement was not a clarifying question, and that content is not the subject of this appeal.

Approximately one hour into the interview, Tallan took a break. He resumed the interview at 10:10 a.m. and began by explaining that defendant was under arrest, that he would be jailed regardless of whether the recorded interview continued and that it was defendant's choice whether to continue the interview. Tallan restated defendant's *Miranda*

rights a third time, and defendant acknowledged that he understood his rights. Defendant did not make any additional references to legal counsel. He continued to deny being at Walmart the previous morning and denied any involvement in the shooting.

At 10:37 a.m., Tallan stopped the interview to get food and to transport defendant to the Salem police station. While on the way to Salem, defendant asked to make a recorded statement and did so using a handheld digital recorder. Defendant said that, contrary to his earlier denial, he had been at the Walmart and had had an argument with Knorr but that he was not responsible for the shooting.

At around 2:00 p.m., Tallan resumed the interview at the Salem police station, beginning again by reading defendant his *Miranda* rights. Defendant said that his attorney "should be done with court" by that time. Tallan asked defendant to clarify, and defendant indicated that he believed his defense lawyer, Raley, should be with him at that point in the investigation. Defendant's subsequent comments were also suppressed by the trial court.

Defendant was charged with murder with a firearm, unlawful use of a weapon with a firearm, and felon in possession of a firearm. He moved to suppress statements that he made during the police interviews, contending that his rights against self-incrimination under Article I, section 12, and under the Fifth Amendment had been violated because the police had disregarded his request for counsel. Defendant argued that, throughout the interviews with Tallan, several of his statements regarding his right to counsel were unequivocal, and, in the alternative, that they were equivocal and not followed by proper clarifying questions by police. The state responded that all of defendant's statements referring to a lawyer "were equivocal at best" and contended that defendant's motion should be denied in its entirety.

The court denied defendant's motion in part. The court explained:

> "The statement that kept coming up in the testimony and in the course of this interview in various forms appears

for the first time [at page 38 of the transcribed interview]. Statement by the defendant, 'If you can put a gun in my hand, if you can put—dude, if you can put a gun in my hand, the gun in my hand, then please go ahead and do so. If not, we should probably contact my lawyer, then be done here because if you can put a gun in my hand, then let's do so.' I find that that is an equivocal assertion at best and *** the exact meaning of that is far from clear. *** [T]he response by Detective Tallan at that point is, 'Let's do what?' I find that this is an appropriate clarifying question.

"The response to that is, 'Put a gun in my hand.' Detective Tallan's response is, 'Okay, I'm not sure what that means.' Again, I find that this—and this appears on page 39 *** in State's Exhibit 1—I find that, again, that is a proper clarifying question.

"The response is, 'That means, where is the gun, put it in my hand.' There is an attempt by the defendant to clarify, but then the defendant gets into his own prompted [sic] statement after this equivocal assertion. I find that the remainder of his statement up at the top of page 39 *** obviates the need for any further clarifying questions at that point.

"So the interview continues. And Detective Tallan *** though he didn't need to, actually goes back to ask another clarifying question down at the bottom of page 39 ***. It is at this point that now it is clear from the whole context of it that the defendant was probably referring to his attorney, Ms. Raley, but he did not do so by name and there wasn't enough there for an officer in Detective Tallan's position, a reasonable officer, to reasonably assess what the meaning was. And, again, I find that this would not have been clear to Detective Tallan and that this was ambiguous and then at best an equivocal assertion.

"Following this, that's when Detective Tallan asks, 'So this sounds like a conditional thing.' Again, it's another attempt, I find, to clarify what the defendant was meaning, what he wanted to do, what he was stating, what he was asking for. The response—I find that it is a proper clarifying question.

"The response was, 'No, it's not condition of anything.' I know that defense counsel argues that this means that it is no[t] but saying it's not conditional, that means that it is

suddenly an unequivocal assertion. I disagree. Merely saying something is not conditional, does not all of a sudden make it clear or even make it unconditional because, again, the literal meaning of what the defendant kept saying and repeating was, in fact, conditional.

"I find that Detective Tallan's next statement again is a clarifying statement and this is on page 40 * * *. In fact, he says, 'It's important that I clarify this.' And then the defendant gets back into his statement about, 'If you can't put a gun in my hands, then we've got nothing to talk about.'"

The court concluded that the remaining statements at the Tigard Police station were admissible; those were the statements defendant made after the break in the interview and after Tallan reread the *Miranda* warnings. The court ruled:

"However, after that Detective Tallan wanted to restart things and * * * beginning by reading the defendant his rights again, again that is another proper attempt to clarify. There was nothing that was gained or that was being exploited from any of the questions in that very, very brief period at the end of the initial interview. And I find that everything else that appears is proper. And looking at page 45 * * *, that phrase again 'If there's no weapon and you can't put it in my hand,' it appears again. This is one of the times * * * where it appears without any reference to an attorney where it's the defendant's attempt to say, 'Stop hiding the ball, would you just show me, tell me what you've got on me,' and, nevertheless, down at the bottom of [that page] * * * Detective Tallan again attempts to clarify.

"I see no other issues with the remainder of the interview at Tigard PD."

The court also denied defendant's motion as to the statements he made while being transported to Salem in the patrol car. The court concluded that defendant had initiated the request and had freely and voluntarily offered those statements. Finally, as noted above, the court suppressed the statements defendant made at the Salem Police Department after he expressed that his lawyer should be present.

Defendant entered a conditional no contest plea, reserving the right to appeal the court's ruling on his motion

to suppress evidence. He now appeals, assigning error to the trial court's ruling and arguing that the court erred by "denying suppression of all of defendant's statements" in violation of his right to be free from self-incrimination under the state and federal constitutions.

The right to be free from self-incrimination is guaranteed by Article I, section 12,[1] and the Fifth Amendment, as applied to the states by the Fourteenth Amendment.[2] Those provisions protect against the inherently coercive effects of custodial interrogation by providing for a suspect's derivative right to counsel. *State v. Scott*, 343 Or 195, 200, 166 P3d 528 (2007); *State v. Meade*, 327 Or 335, 339, 963 P2d 656 (1998). Under each constitutional provision, if a suspect unequivocally requests a lawyer, then the police must cease interrogation and the request must be granted. *Edwards v. Arizona*, 451 US 477, 483-84, 101 S Ct 1880, 68 L Ed 2d 378 (1981); *State v. Kell*, 303 Or 89, 95, 734 P2d 334 (1987) ("[O]nce a suspect in custody unequivocally requests to talk to a lawyer, that request must be granted and questioning should cease.").

The analyses under these constitutional provisions differ when a suspect makes an equivocal request for a lawyer. Under Article I, section 12, when a suspect makes an equivocal request for counsel, the police may ask only "further questions seeking clarification of the suspect's intent." *State v. Charboneau*, 323 Or 38, 54, 913 P2d 308 (1996). Under the Fifth Amendment, if a suspect's request is ambiguous or equivocal, the police are not obligated to pose clarifying questions and may continue the interrogation. *Davis v. United States*, 512 US 452, 461-62, 114 S Ct 2350, 129 L Ed 2d 362 (1994). On appeal, defendant does not argue that, if the unsuppressed statements were equivocal requests for counsel, then the trial court erred in determining that Tallan's responses were proper clarifying questions. Consequently, we focus our analysis on whether defendant made an unequivocal request for counsel.

---

[1] Article I, section 12, provides, in part, "No person shall be * * * compelled in any criminal prosecution to testify against himself."

[2] The Fifth Amendment provides, in part, "No person * * * shall be compelled in any criminal case to be a witness against himself[.]"

We begin with defendant's argument under Article I, section 12. *See State v. Kennedy*, 295 Or 260, 262, 666 P2d 1316 (1983) (court considers and disposes of questions of state law before reaching federal law claims). Our standard is familiar:

> "In determining whether a defendant has made an unequivocal request for counsel, an equivocal request for counsel, or neither, we view the defendant's statement in light of the totality of the circumstances at and preceding the time that it was made, to ascertain whether a reasonable officer in the circumstances would have understood that defendant was invoking his rights."

*State v. Martinez*, 263 Or App 658, 664, 328 P3d 1277, *rev den*, 356 Or 517 (2014) (internal quotation marks and brackets omitted). The totality of the circumstances "includes consideration of certain facts, including the ordinary meaning of the words used by the suspect, the number of requests, the context in which the request was made, and the demeanor of the parties." *Id.* at 665 (citing *State v. Dahlen*, 209 Or App 110, 117, 146 P3d 359, *adh'd to as modified on recons*, 210 Or App 362, 149 P3d 1234 (2006)). "The request must be evaluated only in the light of what preceded the request; a trial court may not consider subsequent events or conversations when deciding whether a request was unequivocal." *Dahlen*, 209 Or App at 117.

Defendant contends that he "repeatedly and unequivocally requested the assistance of a lawyer during the first part of the Tigard interrogation." Therefore, he argues, the subsequent statements he made using the handheld digital recorder while being transported were also tainted by the prior violation. We understand defendant to argue that he made three unequivocal requests for counsel during the course of the first interview: (1) "If you can put a gun in my hand, if you can put, dude if you can put a gun in my hand, the gun in my hand, then please go ahead and do so. If not, then we should probably contact my lawyer because then be done here. Because if you can put a gun in my hand, then let's do so;" (2) "I have a * * * lawyer on my other cases so she might as well deal with this too. I am telling you, if you got a gun and you can put it in my hand, well then let's do so. If you don't then, get my lawyer up here so I can get the hell

out of here because this doesn't work for me;" and (3) "[I]f you can put a gun in my hand, and tell me I fired a gun; then do so, please and we'll move forward in that direction. If not, * * * then get my lawyer up here so I can the hell [*sic*] out of here." Defendant contends that his statement, "It's not conditional of anything," is further support that his request was unequivocal. He views the "condition" of sharing the police's evidence (putting a gun in his hand) as futile and therefore an unambiguous directive to allow him to contact his attorney.

Although the determination regarding whether a particular statement is equivocal is inherently fact bound, our consideration of the issue in *State v. Holcomb*, 213 Or App 168, 159 P3d 1271, *rev den*, 343 Or 224 (2007), provides helpful guidance. In that case, the defendant was suspected of a number of offenses, including murder. He had an extended interview with police and made several incriminating statements. *Id.* at 175. On appeal, the defendant argued that he had unequivocally invoked his right to counsel at several points during the interview.

We concluded that some of the defendant's initial statements were, at best, equivocal requests. The defendant had stated, "I have an attorney an[d] shit," and then focused on the fact that he did not want to be a "snitch" and make "things worse, worse for [him]." *Id.* at 179. In considering those statements, we concluded that the defendant had "merely stated that he had an attorney; he did not say that he wanted to terminate the interview or refuse to answer questions without his attorney being present" and that a reasonable officer, under the totality of the circumstances, would not have understood the statement to be an invocation of the right to counsel.[3] *Id.* at 180.

In contrast, later in the interview, the defendant had said, "[W]hen I get my attorney * * * I'll answer your * * * questions[.]" With regard to that statement, we concluded

---

[3] With regard to the defendant's statements about being a "snitch," we concluded that the defendant "selectively invoked his right to counsel with respect to aspects of the investigation * * * that required defendant to 'snitch' on a third party" and that, given the defendant's partial waiver of his right to counsel, there was no violation of his rights. *Id.*

that the defendant had made an unequivocal request for an attorney because the statement left "no doubt that [he] intended to invoke his right to counsel." *Id.* at 182. That outcome is consistent with other cases in which a suspect has made an unequivocal request. *See, e.g., State v. Acremant*, 338 Or 302, 322, 108 P3d 1139, *cert den*, 546 US 864 (2005) ("I think that I do need a lawyer. I do," is an unequivocal request because it "expressed unambiguously that [the defendant] wished to speak with a lawyer before talking to the detectives"); *State v. Doyle*, 262 Or App 456, 465-66, 324 P3d 598, *rev den*, 355 Or 880 (2014) ("I would like to have an attorney or something here present," is an unequivocal request because it expressed the defendant's "desire to consult with an attorney before continuing to speak to the detectives"); *Dahlen*, 209 Or App at 117-18 ("When can I call an attorney?" is an unequivocal request based on the "ordinary meaning" of "when.").

In this case, defendant's statements could have been interpreted multiple ways by a reasonable police officer under the circumstances. Defendant's first statement followed Tallan's assertion that defendant had seen Knorr the previous day, the day of the shooting. Defendant said:

> "If you can put a gun in my hand, if you can put, dude if you can put a gun in my hand, the gun in my hand, then please go ahead and do so. If not, then we should probably contact my lawyer because then be done here. Because if you can put a gun in my hand, then let's do so."

An officer could have reasonably interpreted defendant's statements in several other ways given the preceding conversation. The statement may have meant, as defendant asserts, that, if the police were unwilling to tell defendant what inculpatory evidence they had collected in the case, then he wished to invoke his right to have counsel present. That is, if the police did not have the actual murder weapon, then they did not have a basis to detain defendant and that his lawyer could and should arrange for his immediate release. Or, the statement may have meant that, if the police could tie defendant to the shooting, *i.e.*, place him at the murder scene, then defendant could understand his purpose in continuing to talk to the police. A reasonable officer

in those circumstances could have understood defendant *not* to have been invoking his rights to counsel. Thus, the statement is not unequivocal.

For much the same reason, defendant's second statement was not unequivocal. Defendant said,

> "I have a * * * lawyer on my other cases so she might as well deal with this too. I am telling you, if you got a gun and you can put it in my hand, well then let's do so. If you don't then, get my lawyer up here so I can get the hell out of here because this doesn't work for me."

Preceding that statement, Tallan had asked defendant whether he wanted a lawyer, in an attempt to clarify whether he was attempting to invoke his right to counsel. Defendant's statement effectively reiterated his first statement and added that his lawyer "might as well deal with this too." As in *Holcomb*, defendant "did not say that he wanted to terminate the interview or refuse to answer questions without his attorney being present." 213 Or App at 180. Defendant's statement could either be a taunt for the police to pin defendant as the shooter by connecting him to the murder weapon or a request for his lawyer to release him. The meaning of defendant's words was far from clear. Unlike the unequivocal statements in *Holcomb*, defendant's statement here *did* leave "doubt that [he] intended to invoke his right to counsel." *Id.* at 182. The statement was not unequivocal.

Finally, preceding defendant's third statement, Tallan had asked, "I am not sure if you want to keep talking or not, but you have given me this condition of, okay, if I can put a gun in your hand then I gotta bring your lawyer in. Well what if I can't? Okay. I don't know that I can." Defendant replied, "[I]f you can put a gun in my hand, and tell me I fired a gun; then do so, please and we'll move forward in that direction. If not, * * * then get my lawyer up here so I can the hell [*sic*] out of here." Defendant also stated, that the police should "scrape" or "scrub" his hand, "get up here in [his] nostrils and * * * eyes" for gun-residue evidence, "whatever, if [Tallan] can put a gun in [defendant's] hand, and tell [defendant that he] fired a gun." Once again, the statement conveyed multiple possible meanings.

A reasonable officer could have interpreted the statement to mean that defendant wished to cooperate with the police investigation by consenting to evidence collection and continuing to speak to the police if they could tie him to the murder with any physical evidence, but if not, then he did not believe the police had enough evidence to detain him.[4] As with the other statements, we conclude that those statements were not unequivocal.

Defendant argues that he is entitled to suppression under the Fifth Amendment. He does not provide an argument as to how case law applying that federal standard results in a distinct analysis or a more favorable result. Consequently, we do not find error regarding the Fifth Amendment. *See State v. McNeely*, 330 Or 457, 468, 8 P3d 212, *cert den*, 531 US 1055 (2000) (declining to consider claim supported by mere summary references to federal constitutional provision).

In sum, the trial court did not err in excluding some statements while admitting other statements given after *Miranda* warnings and in the absence of an unequivocal request for counsel.

Affirmed.

---

[4] Defendant argues that the statement meant that defendant "understood that police could perform gunshot residue examinations without an attorney present, but otherwise he wanted his attorney." Defendant does not explain, under his proposed interpretation of the statement, what he meant by directing, "tell me I fired a gun; *** and we'll *move forward in that direction*." (Emphasis added.)